# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

KYLE W. HOOTEN,                    )
                                   )
      **Plaintiff,**              )
                                   )
V.                                 )          **Case No. 2:12CV57NCC**
                                   )
CAROLYN W. COLVIN,                 )
Commissioner of Social Security    )
                                   )
      **Defendant.[1]**           )

## MEMORANDUM AND OPINION

This is an action under Title 42 U.S.C. § 405 (g) for judicial review of the final decision of the Commissioner denying the application of Kyle W. Hooten (Plaintiff) for Supplemental Security Income (SSI) under Title XVI of the Act. See 42 U.S.C. § 1381. Plaintiff has filed a brief in support of the Complaint. Doc. 21. Defendant has filed a brief in support of the Answer. Doc. 26. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). Doc. 28.

## I.
## PROCEDURAL HISTORY

Plaintiff filed his application for SSI on July 28, 2010, alleging a disability onset date of May 31, 2002. Tr. 75. Plaintiff's application was denied and he requested a hearing before an Administrative Law Judge (ALJ). Tr. 40-49. In May 2011, a hearing was held before an ALJ. Tr. 20-33. In a decision dated July 5, 2011, the ALJ found Plaintiff not disabled. Tr. 5-19.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she should be substituted for Michael J. Astrue as the defendant. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Act.

Plaintiff filed a request for review with the Appeals Council, which denied Plaintiff's request on June 28, 2012. Tr. 1-4. As such, the ALJ's decision is the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. See id.

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). See Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. See Steed, 524 F.3d at 874 n.3; Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial

evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022; see also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

<u>Brand v. Sec'y of Dep't of Health, Educ. & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980); <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." <u>Ford v. Astrue</u>, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

<u>Baker v. Sec'y of Health & Human Servs.</u>, 955 F.2d. 552, 555 (8th Cir. 1992); <u>Polaski</u>, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. <u>See id.</u> The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the

plaintiff's appearance and demeanor at the hearing.  See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.  The Commissioner has to prove this by substantial evidence.

Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which he finds credible. See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

### III.
### DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff, who was 33 years old at the time of the hearing, testified that he had tried to work from June 2009 to June 2010 delivering papers; and he stopped work after he dozed off while driving and had trouble with his eyes. Tr. 22-24. Plaintiff further testified that he had problems with his diabetes, kidneys and heart, was tired most of the time, would often doze off

during the day, could stand about an hour or two at the most, and would get short of breath when he moved around a lot.  Tr. 25-26.

The ALJ found Plaintiff had the severe impairments of cardiomyopathy, hypertension, diabetes mellitus, chronic kidney insufficiency, and obesity, and that his and Meibomian Gland Dysfunction (MGD)[2] was not severe.  The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listed impairment; and that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), except that he was limited to standing and walking two hours in an 8-hour workday.[3]  The ALJ concluded, based on the testimony of a VE, the Medical Vocational Guidelines (Guidelines), and the Dictionary of Occupational Titles (DOT), that there was work in the national economy which Plaintiff could perform, including charge account clerk, order clerk, and escort driver, and that, therefore, Plaintiff was not disabled.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because he failed to give sufficient explanation for the weight given to the opinion of Plaintiff's treating doctor, Michael Quinlan, M.D., as expressed in Dr. Quinlan's April 6, 2011 response to interrogatories.  Dr. Quinlan stated the following in response to interrogatories.  He had treated Plaintiff for "roughly 5 years; Plaintiff's medical problems included diabetes, cardiomyopathy, hypertension, obesity, chronic kidney insufficiency, nocturnal hypoxemia, and hyperlipidemia. Plaintiff suffered from lower extremity edema, did not take any medications that would cause

---

[2] The British Journal of Ophthalmology, 2002 Dec.; 86(1): 1403, states that the meibomian glands secrete lipid into tears and that MGD is the major cause of evaporative dry eye.

[3] The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 404.1567(b).  Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6.

drowsiness, and would be unable to function independently 25 to 50 percent of the time in a sedentary work capacity.  Plaintiff could handle sedentary work on a good day, but he had trouble with excess swelling, edema, uncontrolled blood sugars, and fatigue, and would not be able to maintain a 40-hour workweek.  Plaintiff also suffered from easy fatigability and had times when he could not stay awake.  Tr. 605-606.  For the following reasons, the court finds the ALJ gave proper weight to Dr. Quinlan's opinion and that the ALJ's decision is supported by substantial evidence.

First, upon finding Plaintiff not disabled the ALJ afforded Dr. Quinlan's opinion little weight because the degree of limitations Dr. Quinlan imposed were not supported by objective evidence and were inconsistent with the record as a whole.  Tr. 17.  "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'"  Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2) (2000)).  See also Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009); Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000).  Indeed, if they are not controverted by substantial medical or other evidence, they are binding.  Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)).  While the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data.  See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported

by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing

Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors

are not conclusive in determining disability status and must be supported by medically

acceptable clinical or diagnostic data); 20 C.F.R. § 404.1527(d)(3) (providing that more weight

will be given to an opinion when a medical source presents relevant evidence, such as medical

signs, in support of his or her opinion).  See also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir.

2006) (holding that where a treating physician's notes are inconsistent with his or her RFC

assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d

917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight

"if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and

is not inconsistent with other substantial evidence").  "Although a treating physician's opinion is

entitled to great weight, it does not automatically control or obviate the need to evaluate the

record as a whole."  Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

    In Plaintiff's case, September 17 2002 records from Audrian Medical Center reflect that

Plaintiff's extremities were *negative for cyanosis and peripheral edema*, and his blood pressure

was initially 200/110, but it was lowered to 150/90.[4]  Tr. 145.  See Harris v. Heckler, 756 F.2d

431, 435-36 n.2 (6th Cir. 1985) (conditions which can be controlled by treatment are not

disabling); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (medical conditions which can

be controlled by treatment are not disabling); James for James v. Bowen, 870 F.2d 448, 450 (8th

Cir. 1989).  Also, on this date, Plaintiff's left ventricular ejection fraction was 27%.  See

---

[4] See Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992) (holding that a high blood pressure reading of 170/90 indicates only moderate hypertension); Brown v. Heckler, 767 F.2d 451, 453 (8th Cir. 1985) (holding that blood pressure which measures within the range of 140-180/90-115 is considered mild or moderate, and that hypertension does not qualify as severe where it does not result in damage to the heart, eye, brain or kidney) (citing 20 C.F.R. pt. 404, subpt, P, app. 1, 4.00 C).

http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited Dec. 17, 2013)

("The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. Experts vary in their opinion about an ejection fraction between 50 and 55 percent, and some would consider this a 'borderline' range.").

On October 25, 2002, Gene Thomas, D.O., reported that Plaintiff felt tired and weak, but was not short of breath, and his blood pressure was 177/100. Tr. 163. Charles Tillman, M.D., reported, on January 8, 2003, that Plaintiff's blood pressure was 144/90, his weight was 227 pounds, and his extremities had "1+edema." Dr. Tillman diagnosed Plaintiff with congestive heart failure, hypertension, and left ventricular dysfunction. Tr. 250. On January 24, 2003, Dr. Thomas reported that, upon examination, Plaintiff was "doing fairly good"; he was "not really doing any wheezing"; his *blood pressure was 110/70*; his lungs were clear and *his heart tones were normal; and he had no peripheral edema.* Tr. 161.

Paul J. Hauptman, M.D., Director of the Division of Cardiology Heart Failure/Heat Transplant Department, saw Plaintiff for a consultation on March 24, 2003, and reported that Plaintiff had a prior history of untreated hypertension, but "no other specific medical problems," with the exception of a childhood concussion. He noted that Plaintiff had presented with about one week of increasing shortness of breath and classic signs of heart failure. Dr. Hauptman further reported that Plaintiff's ejection fraction was 16% and 27%; he had mild-to-severe mitral regurgitation and an end diastolic dimension; his coronary arteries were clear; and a right heart catheterization had revealed "reasonable filling pressure." Dr. Hauptman further reported that Plaintiff had been "aggressively treated with medical management and [presently] state[d] that

he *actually feels 'all right.'* He denie[d] any recent palpitations, lightheadedness or presyncope." He ha[d] not experienced the dyspnea that brought him to medical attention in the first place." Tr. 132. Dr. Hauptman noted that Plaintiff said he had been compliant with his medications. Dr. Hauptman additionally reported that Plaintiff's blood pressure was 114/90; initially his respiratory rate was high but it came down during the course of examination; Plaintiff's carotid pulsations were brisk without bruits; his breath sounds were "completely clear"; he had a normal sounding first and second heart sound; there was no right ventricular heave; there was no peripheral edema; and Plaintiff had no cyanosis or clubbing. Dr. Hauptman's plan was to repeat an echocardiogram in six months. He noted that approximately 50% of patients with new onset of myopathy improve, and, based on Plaintiff's examination, lack of symptoms, and normal electrocardiogram, Dr. Hauptman opined that there was a possibility that Plaintiff had improved. Dr. Hauptman also reported that Plaintiff's ejection fraction had "clearly" improved, and noted that Plaintiff should stay out of work until his issues could be clarified. Tr. 134.

An April 4, 2003 CT scan of Plaintiff's chest showed "*complete resolution* of bilateral pulmonary infiltrates and right sided pleural effusion" and fatty infiltration of the liver. (emphasis added). No other abnormalities were seen. Tr. 138. On April 16, 2003, Charles Tillman, M.D., a cardiovascular specialist, reported that Plaintiff had trace edema in his extremities, and, although he was obese at 237 pounds, Plaintiff was without hernias, masses, tenderness, or rebound. Plaintiff's blood pressure was 132/90; his heart had regular rhythm and rate; his chest was clear; and he was encouraged to cut down on his dietary intake. Tr. 182.

It was noted by a nurse practitioner, on April 22, 2003, that Plaintiff had been newly diagnosed with diabetes. Tr. 231. In a July 29, 2003 letter, Dr. Tillman reported that Plaintiff had significant left ventricular dysfunction, and his "functional capacity for anything other than

13

light work would be quite limited." Dr. Tillman also reported that, although Plaintiff had been evaluated for heart transplantation, his left ventricular function had improved; Plaintiff was capable of sitting, standing, lifting light weights and carrying short distances; and he spoke and heard well and could handle objects and could travel short distances. Tr. 180. Dr. Tillman reported, on August 13, 2003, that Plaintiff's left ventricular function had improved, and that Plaintiff had trace, if any, edema in his extremities. Tr. 247.

Dr. Tillman reported that a September 15, 2005 echocardiogram was normal. Tr. 251. It was reported, on December 21, 2005, and June 26, 2006, that Plaintiff's diabetes was uncontrolled. Tr. 218, 222. Dr. Tillman reported that a July 10, 2006 echocardiogram showed that Plaintiff had no intracardiac masses, and no congenital defects. The impression was *mild* left atrial enlargement, with a left ventricular ejection fraction of 45%. Tr. 252.

In October 2006, Dr. Quinlan reported that Plaintiff's blood sugars were 200-300 (Tr. 215), and in January 2007, that Plaintiff was not checking his blood sugar regularly (Tr. 214). In April and August 2007, Dr. Quinlan reported Plaintiff's blood sugars were in the 200s. Tr. 212-13. On each of these dates, Dr. Quinlan reported, in regard to Plaintiff's cardiac exam, he had regular rate and rhythm. He also reported that Plaintiff had no edema, cyanosis, or clubbing and his lungs were clear.

On August 15, 2007, Dr. Tillman reported that Plaintiff denied any signs or symptoms of heart failure. Tr. 238. A September 21, 2007 imaging report states that Plaintiff had been in an motor vehicle accident that day, and presented with neck pain and low back pain. Imaging of the cervical spine showed no recent fracture or dislocation. Imaging of the lumbar spine showed multiple Schmorl's nodes; otherwise the study was normal. Tr. 645-46.

On October 30, 2007, Dr. Quinlan reported that Plaintiff was not using his NovoLog anymore for his diabetes due to the expense, see Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents), although he thought that his sugars had been "a lot better with it," see Brown, 611 F.3d at 955 (conditions which can be controlled by treatment are not disabling). Significantly, Dr. Quinlan reported on this date that Plaintiff had driven in a "demo derby" the prior Saturday night, and noticed he had a knee laceration. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See Eichelberger, 390 F.3d at 590 (ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

Also, on October 30, 2007, upon examination, Dr. Quinlan reported that Plaintiff's blood pressure was 132/88; his neck was without lymphadenopathy or carotid bruits; his heart was clear to auscultation; his abdomen was soft and nontender; his extremities were without clubbing or edema; his motor strength was 5/5 throughout; and his sensation was intact throughout. Dr. Quinlan further reported that Plaintiff presented with phlebitis, and Doppler studies conducted the previous night were unremarkable. Dr. Quinlan's assessment was that the phlebitis was "just

inflammatory"; he would see if medication cleared up the phlebitis; and Plaintiff would continue to "work towards better control" of his diabetes.  Tr. 210-11.  The impression from a November 1, 2007 report from a vascular laboratory noninvasive lower extremity venous examination was a normal venous study of the right lower extremity.  Tr. 647.

Dr. Tillman reported, on March 24, 2008, that Plaintiff had some chest pain after falling off a scaffold (Tr. 237), see Eichelberger, 390 F.3d at 590 (ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible), and, on September 15, 2008, that Plaintiff was doing well and denied any cardiac complaints (Tr. 236).    Plaintiff had a normal Doppler study on September 15, 2008.  Tr. 251.

On October 12, 2008, Dr. Watson reported Plaintiff's blood sugars were better.  Tr. 410.  Dr. Quinlan reported, on November 21, 2008, that Plaintiff was worried about his circulation; he had not been taking his blood sugars and was not taking his NovoLog with meals.  Tr. 619.  See Brown, 87 F.3d at 965 (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain).  Also, on this date, Plaintiff was given a prescription for diabetic shoes and inserts due to his neuropathy.  See Constock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (holding that, upon discrediting the claimant's allegations of back pain, the ALJ properly considered that Plaintiff took aspirin, used a whirlpool tub, and had his wife rub ointment on his back to relieve pain); Benskin, 830 F.2d at 884 (holding that disabling pain not indicated when claimant merely took hot showers and used Advil and aspirin to relieve pain).

Myra Watson, D.O., wrote in a letter to Dr. Quinlan, dated January 28, 2009, stating that, on examination, Plaintiff was in no distress; his heart had regular rate and rhythm; his abdomen

was obese, soft, and nontender; he had trace edema in his extremities; his blood pressure was 130/90; and that her impression included chronic renal failure, dilated cardiomyopathy, hypertension, diabetes, intermittent edema, diarrhea, and history of kidney stones. The plan included an ultrasound of Plaintiff's kidneys. Tr. 368-69. An ultrasound, conducted on February 9, 2009, showed no evidence of hydronephrotic change on either side. Tr. 421.

On February 13, 2009, Dr. Quinlan reported that Plaintiff was unwilling to take medications for tenderness in his feet and that Plaintiff had diabetes with poor compliance. See Brown, 87 F.3d at 965 (claimant's failure to comply with prescribed medical treatment was inconsistent with complaints of disabling pain). Also on this date, Plaintiff's blood pressure was 128/77; his cardiac exam showed regular rate and rhythm; his lungs were clear; and he had no edema, cyanosis, or clubbing in his extremities. Tr. 490.

On April 14, 2009, Plaintiff's blood pressure was 152/102. Plaintiff said his blood sugars were out of control and he did not think they were being followed closely enough to get them under control. His weight was up 12 pounds from his last visit. Dr. Watson encouraged Plaintiff to "get some dietary education for his diabetes and to increase his insulin. Tr. 416. On May 4, 2009, Dr. Watson reported that she "once again got on to [Plaintiff] about how young he was and *not taking better care of himself.*" (emphasis added). She referred him to a consultant to help adjust his blood sugars. Tr. 415. Nurse Practitioner Connie Dunn, noted on July 10, 2009, that Plaintiff was positive for non-adherence to his diabetes regimen; Plaintiff told Ms. Dunn that he" just [did] not" take the NovoLog and his oral medication, and that he had not eaten at all that day. Ms. Dunn noted it was mid-afternoon. Tr. 489.

On November 2, 2009, Dr. Watson noted that Plaintiff was eating "way too much bread and eating things that [were] quick and easy to fix and [was] not actually counting his carbs to try to control his diet like he should." Tr. 409. See Brown, 87 F.3d at 965.

Dr. Watson then reported, on December 14, 2009, that Plaintiff quit eating bread and his blood sugars were "markedly better." See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (conservative treatment is consistent with discrediting claimant's allegation of disabling pain). Plaintiff also had swelling in his feet on this date and his weight was up 6-8 pounds. Tr. 408. On February 8, 2010, Dr. Watson reported that she told Plaintiff she was proud of him for getting his blood sugars under control. Tr. 406. On May 3, 2010, Dr. Tillman reported that, other than some fatigue with lower blood sugars, Plaintiff was "doing well." Tr. 510. Also, on May 3, 2010, Plaintiff had a normal Doppler. Tr. 511. On May 7, 2010, Dr. Watson reported Plaintiff was doing "extremely well"; his weight was down another pound; an echocardiogram had shown a normal ejection fraction; and Plaintiff was "doing great" and had no complaints or problems. Tr. 404.

On September 3, 2010, Dr. Quinlan reported that Plaintiff had been seen to have his left eyelid opened, and he was having drainage and swelling in the eye. Tr. 630. Nurse Practitioner Dunn reported that, on November 26, 2010, Plaintiff said he had not been following up with Dr. Watson and his diabetes had been "out of control." Plaintiff also related that "if he [got] a job then he [would] lose his Healthcare USA and [would] not be able to afford his medicines." Plaintiff declined a foot exam and said his feet were "okay." Tr. 632. Dr. Quinlan reported, on February 14, 2011, that Plaintiff did not look like he was feeling well. He noted that Plaintiff's sugars had been running higher; Plaintiff was in no acute distress; his heart had regular rate and rhythm; his abdomen was obese but soft and Dr. Quinlan thought there was ascetic fluid;

Plaintiff's extremities were without clubbing or edema; Plaintiff's motor strength was 5/5 throughout; and Plaintiff's sensation was intact. Tr. 634.

A February 16, 2011 CT scan of Plaintiff's abdomen showed no evidence of ascites or mass lesion in the abdomen or pelvis. There was an excess of fatty areolar tissue and multiple bilateral healing rib fractures. Tr. 600.

On March 2, 2011, Plaintiff told Dr. Quinlan that he was short of breath, no matter what he did on exertion. Tr. 638. The impression from a March 8, 2011 dual isotope imaging study was normal profusion but there was concern that Plaintiff's "TID" was elevated. Testing further showed a gaited left ventricular ejection fraction during stress of 58% and evidence of right heart uptake. The left ventricle appeared to be enlarged. Tr. 691.

Dr. Quinlan noted Plaintiff's feet were swelling, on March 25, 2011, despite Lasix. The plan was to add medication. Tr. 640.

As a result of a June 2011 sleep study, Plaintiff was started on CPAP. The impression was "excellent results," and it was recommended that Plaintiff use a CPAP without supplemental oxygen. Tr. 669-70.

Jeffrey Couch, M.D., reported on July 27, 2011, that Plaintiff said his fasting blood sugars were in the 150-200 range, and that his blood pressure was well controlled with medication. Upon examination, Dr. Couch's impression was that Plaintiff had blepharitis which accounted for his ocular irritation; Plaintiff was insulin dependent, with no evidence of diabetic retinopathy; Plaintiff did not want a pair of glasses and deferred refraction, see Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain); and Plaintiff was instructed to clean his lid borders at least twice daily with warm compresses, see

Constock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (upon discrediting the claimant's allegations of back pain, ALJ properly considered that Plaintiff took aspirin, used a whirlpool tub, and had his wife rub ointment on his back to relieve pain); Benskin, 830 F.2d at 884 (treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain). Tr. 659-60.

A November 18, 2011 MRI of the right knee showed a large joint effusion but no fracture or dislocation, and ligaments were intact. Tr. 675.

When Plaintiff was admitted to the hospital on February 12, 2012, with headache and worsening renal function, it was reported, in regard to his cardiovascular system, that he had normal rate and rhythm, no murmur or gallop, good pulses equal in all extremities, and normal peripheral perfusion. Examination of his gastrointestinal system showed it was non-tender with no fluid thrill. Examination of his respiratory system showed Plaintiff's lungs were clear and his respirations with non-labored; his breath sounds were equal; and his chest wall was symmetrical and without tenderness. As for his musculoskeletal system, Plaintiff had normal range of motion and normal strength, no tenderness, no deformity, and "swelling over the legs 1+." Chest x-rays showed rib fractures, possibly old and mild right lateral pleural thickening. It was reported that a CT was suggestive that Plaintiff's headaches were related to sinusitis; no infection was revealed. The etiology for his headaches could have been sinusitis or tooth related, tension headaches, migraines, "or less likely from the uremia." Tr. 715-17.

The court finds, therefore, that the objective medical evidence, including Dr. Quinlan's own records, is inconsistent with Dr. Quinlan's opinion that Plaintiff is unable to work. See Hacker, 459 F.3d at 937. In particular, as set forth above, Dr. Quinlan repeatedly reported that Plaintiff's heart had regular rate and rhythm, that Plaintiff's motor strength was 5/5 and his

sensation was intact, and that he was non-complaint, and often reported that Plaintiff had no edema, cyanosis, or clubbing in his extremities.

Second, upon failing to give controlling weight to Dr. Quinlan's opinion that Plaintiff is unable to work, the ALJ considered that Dr. Quinlan's opinion was inconsistent with Plaintiff's daily activities. Tr. 17. As for Plaintiff's daily activities, as noted above, Plaintiff participated in a demolition derby after his alleged onset date. He also reported that his hobby was racing, and that he could follow written instructions and spoken words, handle changes in routine, finish tasks he started, drive, go out alone, shop in stores, pay bills, and count change. Tr. 108-110. See Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible).

Third, Plaintiff's June 2011 sleep study showed excellent results with CPAP; as noted by the ALJ, there was no evidence that Plaintiff's obesity had affected any other body systems, see SSR 02-01p, 2000 WL 628049, at *2-5 (noting obesity involves a combination of factors; "There is no specific weight or BAI that equates with a "severe" or a "not severe" impairment. . . . Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."); and when Plaintiff was compliant, his diabetes was under better control, see Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (holding that if impairment can be controlled by treatment, it cannot be considered disabling).

Fourth, objective testing was inconsistent with Dr. Quinlan's opinion that Plaintiff could not work. For example, as set forth above, Plaintiff's March 2003 right heart catheterization showed reasonable filling pressure; Plaintiff's April 2003 CT scan showed complete resolution

of bilateral pulmonary infiltrates; Plaintiff's September 2005 echocardiogram was normal; the impression from Plaintiff's July 2006 echocardiogram was mild left atrial enlargement; Plaintiff's September 2007 imaging showed no recent fracture or dislocation of the cervical spine and, with the exception of Schmorl's nodes, Plaintiff's lumbar spine was normal; Plaintiff had a normal venous study in November 2007; Plaintiff's September 2008 Doppler study was normal; Plaintiff's February 2009 kidney ultrasound showed no hydronephrotic change; and March 2011 dual isotope imaging showed normal profusion. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (ALJ properly considered that objective test results were contrary to claimant's allegations of disability).

Fifth, to the extent Dr. Quinlan checked boxes on a form to indicate Plaintiff was unable to work, a treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. See Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961; SSR 96-2p.

Sixth, the court finds the ALJ did provide good reasons for his failing to give controlling weight to Dr. Quinlan's opinion, and that the ALJ's decision in this regard is based on substantial evidence. See SSR 96-2p at *5 (clarifying that 20 C.F.R. §§ 404.1527 and 416.927 require ALJs provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)"). See also Martise v. Astrue, 641 F3d 909 (8th Cir. 2010).

Seventh, the court finds that in reaching his conclusions that controlling weight should not be given to Dr. Quinlan's opinion and that Plaintiff had the RFC to perform light work with additional limitations, the ALJ properly considered the medical evidence as well as all other credible evidence of record. See Sing v. Apfel, 222 F.3d 448, 451-52 (8th Cir. 2000).

In conclusion, the court finds that the ALJ's RFC determination is based on substantial evidence on the record as a whole, see Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). The court also finds that the ALJ considered and gave proper weight to the medical evidence of record, including Dr. Quinlan's opinion, and to Plaintiff's subjective complaints upon determining Plaintiff's RFC, see Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"). Indeed, a VE testified that there was work which a person of Plaintiff's age and education and with his RFC could perform, including charge account clerk, order clerk, and escort driver, and that these jobs existed in significant numbers in the State and national economy. Tr. 30-31. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion ... that the ALJ's findings of [the claimant's] RFC are supported by substantial evidence, we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.")") (internal quotations omitted). As such, the court finds that the ALJ's determination that Plaintiff was not disabled is based on substantial evidence.

## IV.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in his Complaint and Brief in Support of Complaint be **DENIED**; Docs. 1, 21,

**IT IS ORDERED** that a separate judgment be entered incorporating this Memorandum Opinion.


Dated this 25th Day of February 2014.


/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE